**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**EDWARD JAMES COFFMAN,**

      **Plaintiff,**

**v.**                                 **Case No.: 2:16-cv-00597**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f, for the period prior to October 1, 2014.[1] The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 12, 13).

---

[1] Plaintiff was adjudged to be disabled beginning on October 1, 2014. This action concerns the Commissioner's decision that Plaintiff was not disabled for the time period of April 1, 2010 (Claimant's alleged onset of disability) through September 30, 2012 (his date last insured).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I. <u>Procedural History</u>

On September 6, 2012, Plaintiff Edward James Coffman ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of April 1, 2010, (Tr. at 391-404), due to "upper respiratory condition, difficulty breathing due to scar tissue on right lung, pain, pain in upper back, pain in neck, difficulty moving left arm due to rotator cuff, arthritis in back and shoulders, and arthritis in hands and fingers." (Tr. at 647). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 212-33, 235-48). Claimant filed a request for an administrative hearing, which was held on October 24, 2014 before the Honorable Valerie A. Bawolek, Administrative Law Judge ("ALJ"). (Tr. at 124-43). A supplemental hearing was held on February 2, 2015. (Tr. at 32-54). By written decision dated February 26, 2015, the ALJ found that Claimant was disabled as defined in the Social Security Act beginning on October 1, 2014, but was not disabled prior to that date. (Tr. at 9-31). The ALJ's decision became the final decision of the Commissioner on December 14, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 12). In

response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 13). Claimant filed a Reply to the Commissioner's brief. (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 55 years old at the time of his alleged onset of disability and 60 years old at the time of the ALJ's decision. (Tr. at 391). He has at least a high school education and communicates in English. (Tr. at 646, 648). He previously worked as a roofing laborer, landscaper, kennel care worker at a pet store, customer service representative in telephone sales (telemarketing), janitor, maintenance worker, and a census worker. (Tr. at 649, 662).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental

3

ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique,

4

the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2012. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 1, 2010, the alleged disability onset date. (*Id.* at No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "cervical degenerative disc disease and congenital abnormalities, degenerative joint disease, hearing loss and tinnitus, and a history of pneumothoraces." (Tr. at 16-17, Finding No. 3). The ALJ also considered Claimant's self-reported bipolar disorder, but determined that the condition was non-severe. (Tr. at 17, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-19, Finding No. 4). Accordingly, the ALJ determined that prior to October 1, 2014, Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could never reach overhead and could only occasionally reach in other directions. He could never climb ladders, ropes, and scaffolds; or kneel and crawl, as part of a job. He could only occasionally stoop, crouch, and balance. He could only occasionally climb stairs and ramps. He would have to avoid hazards, including unprotected heights and dangerous machinery; and would have to avoid concentrated exposure [to] pulmonary irritants, extremes of temperature, and vibration. He could not work in a loud environment.

(Tr. at 19-24, Finding No. 5).

However, the ALJ noted the medical expert's testimony at the supplemental hearing, which considered "new and material evidence" beginning in October 2014 regarding Claimant's left shoulder, which further reduced Claimant's RFC. (Tr. at 24,

6

Finding No. 6). Secondary to the new evidence, Claimant was limited to reaching less than occasionally. (*Id.*). Therefore, the ALJ found that beginning on October 1, 2014, Claimant possessed.

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could never reach overhead and can reach in other directions less than occasionally. He can never climb ladders, ropes, and scaffolds, kneel, or crawl, as part of a job. He can only occasionally stoop, crouch, and balance. He can occasionally climb stairs and ramps. He must avoid hazards including, unprotected heights and dangerous machinery. He must avoid concentrated pulmonary irritants, extremes of temperature, and vibration. He cannot work in a loud environment.

(Tr. at 24, Finding No. 6).

At the fourth step, the ALJ first examined Claimant's ability to perform past relevant work prior to October 1, 2014. Using the RFC finding pertinent to that time frame and relying on the opinions of a vocational expert, the ALJ determined that Claimant was able to perform his past relevant work as a telemarketer, because it did not require the performance of work-related activities that were precluded by his RFC. (Tr. at 24-25, Finding No. 7). Moving then to Claimant's ability to perform past relevant work for the period on and after October 1, 2014, the ALJ concluded that Claimant could not perform the duties of a telemarketer because his ability to reach and handle was reduced to less than occasionally. Thus, under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity beginning on October 1, 2014. (Tr. at 25, Finding Nos. 8-12). The ALJ considered that (1) Claimant was defined as an individual closely approaching advanced age on the alleged disability onset date; (2) had at least a high school education and could communicate in English; and (3) did not have work skills that are transferable to other occupations within

Claimant's RFC. (*Id.* at Finding Nos. 9-11). Given Claimant's age, education, work experience, and RFC, the ALJ found that there were no jobs that existed in significant numbers in the national economy that Claimant could perform beginning on October 1, 2014. (*Id.* at Finding No. 12).

In summary, the ALJ found that Claimant was not disabled prior to October 1, 2014, but became disabled on that date and continued to be disabled through the date of the ALJ's decision. Consequently, the ALJ determined that Claimant was entitled to SSI effective October 1, 2014. On the other hand, Claimant was not entitled to DIB, because he was not disabled within the meaning of the Social Security Act at any time on or before September 30, 2012, his date last insured. (*Id.* at Finding Nos. 13-14).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises a single challenge to the Commissioner's decision. He states that the ALJ failed to perform the required function-by-function analysis when determining his RFC. (ECF No. 12 at 9). Specifically, Claimant argues that the ALJ "failed entirely to address [Claimant's] neck pain and limited neck range of motion which was very well documented" and "included no limitations in her RFC to account for the limited range of motion in [Claimant's] neck." (*Id.* at 12-13). Claimant contends that the ALJ erred in not addressing in the RFC analysis the impact of Claimant's "cervical spine findings with regard to his neck pain and neck movement, documented in 2011 and 2012" and also failed to "specifically address consultative physician Dr. Beard's finding regarding [Claimant's] limited range of motion and pain on trying to turn his head." (*Id.* at 15). Overall, as stated in his reply brief, Claimant's position is that it was an error for the ALJ to not include in the RFC finding any limitations "that flowed from [Claimant's] cervical spine impairment" and not provide any "identifiable rationale" for not including such

limitations. (ECF No.  14 at 2).

In response to Claimant's arguments, the Commissioner contends that the ALJ specifically addressed Claimant's "musculoskeletal exams, x-ray and MRI results, medical opinions, symptoms, and daily activities." (ECF No.  13 at 8). Further, the Commissioner argues that the ALJ relied on expert medical assessments and Claimant's vigorous activities of daily living in finding that Claimant was not disabled prior to October 1, 2014. (*Id.* at 9). Finally, the Commissioner contends that despite Claimant's arguments, the Court can undertake meaningful review of the ALJ's decision because the ALJ included "a full narrative discussion of the evidence that she reviewed" and "on which she relied;" the Commissioner argues that "[g]iven the ALJ's clear evaluation of the medical opinions and other evidence, this case presents no ambiguity about what the ALJ intended [Claimant's] RFC to be." (*Id.* at 10-11).

## V.   <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. *Treatment Records*

On May 19, 2011, Claimant complained of neck and shoulder pain, which radiated toward his left arm. (Tr. at 1209). An x-ray of his cervical spine showed fusion of C5-C6 and mild to moderate degenerative changes. (Tr. at 956). He had active degenerative joint disease. (Tr. at 1212). A few months later, MRIs were taken of his cervical spine; they both showed congenital and degenerative changes. On August 17, 2011, an MRI revealed partial C5-6 vertebral body fusion; significant multifocal stenotic disease resulting from a combination of facet arthropathy, uncovertebral joint degeneration,

9

and intervertebral osteochondrosis with marginal hypertrophy and discal displacement; and a focal signal alteration in the T2 vertebral body of undetermined etiology. (Tr. at 955).

An MRI taken on September 22, 2011 showed that Claimant had a constitutionally small bony spinal canal, which was a major predisposition to spinal stenosis, mild to moderate spinal stenosis at C3-4 and C4-5 due to diffuse subligamentous disc superimposed upon his small spinal canal, incomplete segmentation anomaly of the bodies of C5 and C6 with a rudimentary disc space at this level, and severe narrowing of the left C3-4 neural foramen and severe narrowing of the right and left C6-7 neural foramen due to Luschka joint disease. (Tr. at 953).

Claimant continued to complain of cervical pain that radiated toward both shoulders. (Tr. at 945). During a follow-up visit on February 7, 2012, his primary care provider stated that Claimant had cervicalgia due to degenerative joint disease; the plan was to continue Lortab for his neck pain symptoms. (Tr. at 947). Claimant also had a physical therapy consultation during which he reported experiencing neck problems for 3 to 4 years. (Tr. at 938). He stated that he had neck pain on both sides, but that it was worse on the left. (*Id.*). He rated his neck pain to be a "4 or 5" out of "10," but said it was not a "bad day." (*Id.*). He had normal cervical range of motion on the right, but limited range of motion on the left. (*Id.*). He complained of increased left cervical pain with flexion and rotation. (*Id.*). Claimant was issued a TENS unit. (*Id.*). Claimant elected not to pursue physical therapy due to the travel expense. (Tr. at 939).

Approximately six months later, on August 10, 2012, Claimant still complained of pain in the cervical area that was radiating toward both shoulders. (Tr. at 1011). He stated that his symptoms were worse in humid weather. (*Id.*). Again, the impression was

cervicalgia due to degenerative joint disease and he was instructed to continue taking Lortab for his neck pain symptoms. (Tr. at 1013). He continued to have active degenerative joint disease. (Tr. at 1015). Later that year, on October 9, 2012, Claimant requested an increase of pain medication for his neck pain. (Tr. at 860). He stated that his overall pain level at that point was a "7." (Tr. at 862).

In February 2013, Claimant continued to complain of pain and had active degenerative disc disease. (Tr. at 759, 761). He was treated with medication. (*Id.*). Eventually, on June 3, 2013, Claimant presented to a pain management clinic for his neck and shoulder joint pain. (Tr. at 1161). He reported experiencing the pain for 3 or 4 years and described it as worsening. (*Id.*). He stated that it ranged from a "4 to 9" out of "10" and was a "7" out of "10" on average, including on the day of the visit. (*Id.*). His records from the pain management clinic noted his symptoms regarding his neck, including an abnormal range of motion of his neck on June 12, 2013.  (Tr. at 1160).

On August 15, 2013, Claimant returned to his primary care provider for "ear ringing," but he also complained of pain and stated that he was seen at a pain clinic and was given Percocet. (Tr. at 741). Degenerative disc disease was listed as one of his active problems, but there were no specific notes relating to his neck on that visit. (Tr. at 744). On May 24, 2014, Claimant presented to his primary care provider for a scheduled visit. (Tr. at 1283). He complained of neck pain and stated that he was going to a pain clinic and receiving Percocet 10 mgs, but that he did not want to return to the pain clinic. (*Id.*). The plan was to x-ray Claimant's spine and review his pain clinic records to consider narcotic analgesics. (Tr. at 1286). Claimant was given Naproxen 500 mgs to use twice per day and advised to go to physical therapy, which he declined. (*Id.*). The x-ray was performed on June 10, 2014; it showed moderate degenerative changes of his cervical

spine with fusion of C5-C6. (Tr. at 1264).

On September 10, 2014, Claimant reported during a regular follow-up appointment that he had a lot of pain in his neck and left shoulder. (Tr. at 1266). He stated that he was taking hydrocodone, but went to a pain clinic and was put on oxycodone; he felt like he had to take more of the oxycodone. (*Id.*). The plan was to take an x-ray and MRI in order to send Claimant "out for pain management." (Tr. at 1270). The x-ray to evaluate Claimant's worsening neck pain was taken on October 17, 2014; it showed fusion of C5-C6, which was the same finding as his previous examination on June 10, 2014, and moderate degenerative changes of the cervical spine. (Tr. at 61). The letter advising him of his test results noted that he had moderate arthritis that was a typical result of the aging process. (Tr. at 94). The MRI of Claimant's cervical spine was taken on December 19, 2014. (Tr. at 57). The impression was multilevel degenerative disc disease with severe spinal canal stenosis and severe left neuroforaminal stenosis at C3-C4 and a bright lesion in the anterior T2 vertebral body, which could represent a hemangioma. (Tr. at 58). An MRI taken the same day of Claimant's left shoulder showed a partial thickness tear of the superior tendon, biceps tenosynovitis, and degenerative changes of the AC joint. (Tr. at 60).

On December 23, 2014, Claimant had a pain management consultation. (Tr. at 100). His chief complaint was neck and left shoulder pain. (*Id.*). He reported having those symptoms for 15 years, and stated that driving and turning his head to the left side produced pain, which he rated to be a "6 to 7." (Tr. at 101). He did not have radicular symptoms. (*Id.*). He described his neck pain as aching, grinding, piercing, and unimproved by anything. (*Id.*). His cervical range of motion was restricted on the left side. (Tr. at 102). The impression was, *inter alia*, neck muscle spasms and cervical spinal

stenosis. (*Id.*). He was scheduled for a trigger point injection in his neck. (*Id.*).

On March 26, 2015, Claimant continued to complain of neck pain during a rehabilitation medicine evaluation. (Tr. at 74). However, on May 6, 2015, when Claimant presented for his trigger point injection, he stated that he felt much better in the neck and was no longer experiencing pain or tingling in his fingers or weakness in his upper extremities. (Tr. at 114). He still experienced "locking" of his neck when he turned it to the left. (*Id.*). The physician elected to discharge him as his symptoms were "well-controlled" and instructed him to use a heating pad and TENS unit and make another appointment if needed. (Tr. at 114-15). The following month, on June 3, 2015, Claimant complained during a regular follow-up visit that he had "a lot" of neck pain from deteriorating discs. (Tr. at 115).

### B. Evaluations and Opinions

On November 14, 2012, Kip Beard, M.D., completed a consultative examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 716-726). Claimant related having chronic neck and lower back pain as early as 2005, which was "gradually worse in relation to his work." (Tr. at 717). He stated that his MRIs showed degenerative disc disease, arthritis, and nerve damage. (*Id.*). He had not seen a neurosurgeon and was treated with medications and physical therapy. (*Id.*). His neck and lower back pain was a constant "6 to 7" on a "10-point" scale. (*Id.*). His neck pain ran toward his left shoulder and arm and he complained of intermittent weakness in his left arm. (*Id.*). Dr. Beard noted that Claimant's cervical spine MRI showed multilevel mild degenerative disc disease and spondylosis with up to moderate canal stenosis at the C3-4 and C4-5 level. (Tr. at 718). During his cervical spine examination, Claimant complained of stiffness and some mild pain with range of motion testing, as well as some

paraverterbral tenderness, but did not have any spasm. (Tr. at 719). He could extend to 50 degrees and rotate to 70 degrees bilaterally. (*Id.*). There was no myelopathy or radiculopathy. (Tr. at 720). Dr. Beard's impression was that, among other conditions, Claimant had multilevel cervical degenerative disc disease and spondylosis with central canal stenosis and probable arthritis. (*Id.*). Dr. Beard noted that Claimant had "motion loss of the neck and back," but his reflexes were symmetric. (*Id.*).

On November 28, 2012, Dominic Gaziano, M.D., assessed Claimant's RFC at the initial level of his DIB and SSI claims. (Tr. at 172-75). He opined that Claimant was capable of light work with only occasional climbing of ladders, ropes, and scaffolds; no concentrated exposure to extreme temperature or vibration; and not even moderate exposure to noise, fumes, and hazards. (Tr. at 172-73). Dr. Gaziano opined that despite his limitations, Claimant could perform his past relevant work as a census enumerator and was not disabled. (Tr. at 175).

On March 8, 2013, Rabah Boukhemis, M.D., assessed Claimant's RFC at the reconsideration level of his claims. (Tr. at 193-94). He made the same findings as Dr. Gaziano and agreed that Claimant could perform his past work as a census enumerator and was not disabled. (Tr. at 193-96).

During the initial administrative hearing on October 24, 2014, Judith Brendemuehl, M.D., testified that Claimant has degenerative disease on top of an underlying congenital bony abnormality of his spine. (Tr. at 131). Regarding congenital conditions, she stated that Claimant has a constitutionally small spinal canal from C3-C6 and fusion of C5-C6. (Tr. at 130-31). Claimant also has degenerative conditions of disc osteophyte complexes that resulted in severe narrowing of his left neural foramina at C3-C4 and C6-C7 and right neural foramina at C6-C7. (*Id.*). Dr. Brendemuehl noted

that Claimant's treatment records did not "do a really good job of physical exams" and that the primary limitation was documented in Dr. Beard's clinical examination. (Tr. at 131-32). She opined that she was not sure if she would limit Claimant to sedentary work because Claimant was working at a pawn shop and walking to work every day. (Tr. at 132). Overall, she opined that Claimant was capable of light work, but in view of Dr. Beard's findings that Claimant had decreased range of motion of his cervical spine and shoulders, he was limited to never reaching overhead and only occasionally reaching in other directions. (Tr. at 131-32). Given that Claimant had "some limitation in truncal flexion and with his neck," he could never climb ladders, ropes, or scaffolds or kneel or crawl and only occasionally climb stairs or ramps and balance. (Tr. at 132). However, despite Dr. Beard's findings, Dr. Brendemuehl stated that most of Claimant's treatment records "did not find much in the way of abnormalities with regard to [Claimant's] neck." (Tr. at 133).

During the supplemental administrative hearing on February 2, 2015, Dr. Brendemuehl stated that in light of new medical evidence regarding Claimant's left shoulder and elbow, Claimant would be limited to reaching less than occasionally in any direction with his left upper extremity. (Tr. at 38). However, she did not amend her previous testimony regarding Claimant's neck.

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support
> a particular conclusion. It consists of more than a mere scintilla of
> evidence but may be somewhat less than a preponderance. If there is
> evidence to justify a refusal to direct a verdict were the case before a jury,
> then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct

a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson

v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed

applicable regulations and rulings in reaching his decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence

exists, the Court must affirm the Commissioner's decision "even should the court

disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

In his single challenge to the Commissioner's decision, Claimant contends that

the ALJ failed to perform the required function-by-function analysis when determining

his RFC. (ECF No. 12 at 9). Specifically, Claimant argues that the ALJ "failed entirely to

address [Claimant's] neck pain and limited neck range of motion which was very well

documented" and "included no limitations in her RFC to account for the limited range

of motion in [Claimant's] neck" or any "identifiable rationale" to explain the absence of

additional limitations regarding his neck. (*Id.* at 12-13; ECF No. 14 at 2).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess

a claimant's RFC, which is the claimant's "ability to do sustained work-related physical

and mental activities in a work setting on a regular and continuing basis." SSR 96-8p,

1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite

his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR 404.1545(b-d) and 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, contrary to Claimant's assertion, the ALJ performed a function-by-function analysis, specifically addressing Claimant's reported neck pain and limited range of motion, and included the restrictions in the RFC finding that were fully consistent with the evidence of record. First, the ALJ acknowledged Claimant's testimony that he had difficulty turning his neck, was in constant pain that radiated to his left arm, had to turn his whole body while driving, and received little pain relief from medications. (Tr. at 20). However, the ALJ noted that Claimant worked after the alleged onset date at a pawn shop for 32 to 40 hours per week and swept floors, mopped, and waited on customers; he was on his feet most of the day. (*Id.*). Ultimately, after a thorough discussion and analysis, the ALJ found that the evidence of Claimant's activities of daily living and the objective medical evidence established that Claimant had a greater sustained capacity than alleged; accordingly, the ALJ determined that Claimant's subjective complaints and alleged limitations were not fully persuasive. Claimant does not challenge this credibility analysis or finding.

In addition, contrary to Claimant's assertion, the ALJ specifically discussed Dr. Beard's opinions and findings from the consultative examination, stating that the "MRI of [Claimant's] cervical spine showed multilevel disease and stenosis with clinical

18

indication of motion loss of the neck and back," but that "reflexes were symmetric." (Tr. at 21). The ALJ also noted that "[t]here was not clinical myelopathy or radiculopathy." (*Id.*). Importantly, as discussed below, Dr. Beard did not provide any opinion as to Claimant's RFC. Therefore, any intimation that the ALJ's RFC finding discounted or conflicted with Dr. Beard's report is incorrect.

In fact, the ALJ afforded great weight to Dr. Brendemuehl's opinions, which directly considered Dr. Beard's findings that Claimant had decreased range of motion of his cervical spine. (Tr. at 22-23, 131). As the ALJ stated, Dr. Brendemuehl testified that Claimant's September 22, 2011 MRI showed severe impairments of cervical degenerative disc disease with congenital abnormalities from C3 to C6, which included severe narrowing and congenital fusion. (Tr. at 22, 130-31). Further, Dr. Brendemuehl testified that although the treatment records were lacking in terms of physical exams of Claimant's neck, Dr. Beard's examination approximately a year after the foregoing MRI showed decreased range of motion of Claimant's cervical spine. (Tr. at 131). Given that limitation and Claimant's limited range of motion of his shoulder, Dr. Brendemuehl opined that Claimant could never reach overhead and could only occasionally reach in other directions. (*Id.*). The ALJ directly incorporated these restrictions in the RFC finding, as well as other exertional and non-exertional restrictions stated by Dr. Brendemuehl.

Overall, the ALJ complied with the law in evaluating Claimant's functional abilities in consideration of the objective medical evidence, opinion evidence, and Claimant's allegations regarding his neck. (Tr. at 19-24). Claimant generally asserts that the ALJ failed to perform a function-by-function analysis and that it was error for the ALJ to not include additional limitations in Claimant's RFC relating to his neck. Yet,

Claimant does not point to any evidence supporting additional limitations, does not identify which function the ALJ purportedly overlooked, or state which limitations should have been included in the RFC. *See, e.g., Nock v. Comm'r, Soc. Sec. Admin.*, No. SAG-14-3986, 2015 WL 5781988, at *3 (D. Md. Sept. 30, 2015) ("Ms. Nock does not support that argument with any medical evidence or even any suggestion of the type of restrictions that, in her view, should have been included in the RFC assessment. Ultimately, there is no requirement that every severe impairment be addressed via a particular limitation in an RFC assessment. Moreover, in this case, the general restrictions to light work and to no overhead reaching adequately address the complaints of neck pain reflected in the medical records.")

Notably, this is not a case, as in *Mascio* or its progeny, in which there are conflicting opinions which could potentially further limit Claimant's RFC. Rather, in this matter there are several RFC opinions and none of them are more restrictive than the ALJ's RFC finding. Indeed, the ALJ assigned the greatest weight to the opinion of Dr. Brendemuehl, who considered Claimant's treatment records, his activities of daily living, and the medical source statements before rendering her opinions at the administrative hearing. The ALJ's RFC finding is entirely consistent with Dr. Brendemuehl's testimony. (Tr. at 19, 131-32). The ALJ limited Claimant's RFC to never reaching overhead and only occasional reaching in other directions. In doing so, the ALJ examined all of the evidence, assigned weight to the various opinions, and explained her rationale for such conclusions. Therefore, the ALJ's RFC decision is supported by substantial evidence from the record and remand is not warranted in this matter. *See Mascio*, 780 F.3d 632, 636 (4th Cir. 2015) ("[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite

20

contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.")

Moreover, this case is distinguishable from the case cited by Claimant: *Bobbitt v. Colvin*, No. 2:14-CV-18702, 2015 WL 5684132 (S.D. W. Va. Sept. 28, 2015). In *Bobbitt*, the ALJ gave significant weight to the consultative examiner's findings that the claimant had limited range of motion, but did not include any reference to range-of-motion limitations in the RFC or explain why further limitations were not necessary. However, in this matter, Claimant's **limited range of motion was considered and, more importantly, its functional consequences were incorporated into Claimant's RFC based on medical expert testimony presented at the administrative hearing**. Here, the ALJ gave great weight to Dr. Brendemuehl's opinion, which, as noted, explicitly considered and incorporated consultative examiner Dr. Beard's findings of neck pain and limited range of motion. Dr. Beard did not provide a RFC opinion, but Dr. Brendemuehl directly relied upon his findings in arriving at her RFC opinion. Therefore, there is no conflicting evidence which the ALJ failed to consider, discuss, or incorporate into the RFC. The impact of Claimant's neck impairment on his ability to perform basic work activities was fully considered, and functional limitations designed to account for the neck impairment were included in Claimant's RFC finding. (Tr. at 19, 131-33).

As shown above, it is clear from the ALJ's decision that the objective evidence (such as Claimant's MRI) and the opinion evidence regarding Claimant's neck impairment was considered and incorporated into Claimant's RFC. While Claimant may disagree with the ALJ's RFC finding, and, by extension, the opinions of the medical experts in this matter, "the determination of a claimant's RFC is ultimately the province

of the ALJ as the representative of the Commissioner." *McPherson v. Astrue*, 605 F. Supp. 2d 744, 755 (S.D. W. Va. 2009) (citing 20 C.F.R. § 404.1527(e)(2); *see also Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990)." "The reviewing court's sole responsibility is to determine whether the ALJ's determination of the claimant's RFC is rational and based on substantial evidence." *Id.* (citing *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir.1974)).

In this case, the ALJ's RFC determination complies with the law and is supported by substantial evidence. Therefore, the decision of the Commissioner should be affirmed.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis

of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 30, 2016

Cheryl A. Eifert
United States Magistrate Judge